# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| **UNITED STATES OF AMERICA**, <br> Plaintiff, <br><br><br> v. <br><br><br> **ANDRÉS NOEL PAGÁN SANTOS**, <br> Defendant. | CRIM. NO. 19-0068 (PAD) |

## <u>REPORT AND RECOMMENDATION</u>

Pending before the Court is the defendant, Andrés Noel Pagán Santos' ("Pagán Santos" or the "defendant") "Motion to Suppress Statements" (the "Motion to Suppress"). Docket No. 50. In his Motion to Suppress, the defendant moves the Court to suppress three sets of statements that he made to federal agents between the time of his arrest by the Puerto Rico Police Bureau ("PRPB") at approximately 3:00PM on Thursday, January 10, 2019, and when he was brought before a U.S. Magistrate Judge for his initial appearance on Monday, January 14, 2019.[1] The defendant claims that the statements he made to *federal* agents were procured beyond the six-hour window required for prompt presentment under 18 U.S.C. §3501(c) and that there was no reasonable justification to excuse the delay. If so, the *McNabb-Mallory* rule would require their suppression. The defendant also claims that the statements he made to both the local *and* federal agents were involuntary under the Fifth and Sixth Amendments of the U.S. Constitution and thus should also be suppressed.

---

[1] The government indicated in its opposition to the Motion to Suppress (Docket No. 56 at 23) that it does not intend to introduce the third statement made to the FBI on Monday, January 14, 2019, in its case-in-chief. The government therefore indicated that the challenge to the admissibility of that statement is moot. Accordingly, in the interest of judicial economy, the Court will not address the admissibility of that third statement made to the FBI. The Court will only analyze the admissibility of the statements made to the FBI on Friday, January 11, 2019, and Saturday, January 12, 2019.

The government filed an opposition to the Motion to Suppress at Docket No. 56 (the "Opposition"). The defendant filed a reply at Docket No. 64 (the "Reply"), and the government submitted a sur-reply at Docket No. 67 (the "Sur-Reply"). The Court referred the matter to the undersigned for adjudication and the issuance of a report and recommendation. Docket No. 61. As soon as the Court reopened for in-person hearings after the pandemic, and over the objection of the government, the Court held an in-person suppression hearing. Docket No. 121. For the reasons espoused more thoroughly below, the undersigned recommends that the Court **DENY** the defendant's Motion to Suppress.

## I.   FINDINGS OF FACT[2]

### A.   Defendant's inculpatory statement made to PRPB agents immediately upon his arrest on Thursday, January 10, 2019

On Thursday, January 10, 2019, agents from the PRPB received information that an individual by the name of Deny O'Neil Delgado Figueroa ("Deny") had gone missing. Hearing Transcript ("Tr.") at 18. Deny's girlfriend told police that the last person to see Deny was his longtime friend Pagán Santos. *Id.* at 19.

In an effort to speak with Pagán Santos, the PRPB agents drove to his address but were unable to enter the urbanization because it had controlled access. *Id.* PRPB agents then contacted Pagán Santos' mother at a nearby retail store in Mayagüez, P.R. where she worked. She called Pagán Santos on his cellphone and told him that the PRPB wanted to speak with him regarding an ongoing investigation. *Id.* at 20. Pagán Santos agreed to pass by the police station after 2:00PM when he got off work. *Id.*

---

[2] The findings of fact were derived from the testimonial and documentary evidence presented by the government, which included the in-person testimony of PRPB Agent Rafael Mercado, FBI Task Force Officer Ramón Soto Rodríguez, and FBI Task Force Officer José Valle. The Court also admitted government's exhibits 1, 1-A, 2, 2-A, 3, 3-A, 4, 4-A, 5, and 5-A. Joint Exhibit I was also presented and admitted into evidence.

Later that day, after getting off work, Pagán Santos voluntarily showed up at the Mayagüez police station between 2:00PM and 2:05PM. *Id.* at 21. He was immediately placed in an interrogation room where Agent Rafael Enrique Mercado Ruiz began to interview him. *Id.* at 22. After just a couple of minutes, Pagán Santos began to recount his participation in a purported "plan to steal a vehicle." *Id.* at 23. Upon hearing this, Agent Mercado Ruiz immediately stopped the interview to advise Pagán Santos of his *Miranda* rights. *Id.* at 23. He handed Pagán Santos a document that explained his rights and asked Pagán Santos to review it and place his initials next to each warning provided. *Id.* at 24. *See also,* Govt. Ex. 1 (the "Advice of Rights Form"). Pagán Santos acquiesced and placed his initials next to each box on the top part of the Advice of Rights Form identifying each warning he acknowledged having reviewed. He also checked the box indicating that "he was exercising his right to read the form himself." *See*, Govt. Ex. 1-A. And finally, he checked the box that indicated that,

> I understand the rights that those warnings bestow upon me and I **voluntarily waive** the same with the knowledge that I can stop being questioned and/or invoke my right to an attorney at any time. The waiver of these rights has been without coercion, intimidation, violence, pressure or promises.

*Id.* (Emphasis added). Agent Mercado Ruiz then wrote the time, "2:10PM," on the appropriate line documenting the time when the interview began. *Id.* at 27. *See also,* Govt. Ex. 1-A. Agent Mercado Ruiz testified during the suppression hearing that when Pagán Santos was asked if he understood the warnings and whether he wanted a lawyer present, he responded by saying, "No, No, I don't want a lawyer." Tr. at 27.

After finishing the interview, Agent Mercado Ruiz asked Pagán Santos if he would be willing to write down everything he had just said. *Id.* at 28. To wit, Pagán Santos said, "yes, no problem." *Id.* Agent Mercado Ruiz then handed Pagán Santos a special form whereupon Pagán Santos wrote down everything he had previously stated to Agent Mercado Ruiz. *Id. See also*, Govt. Ex. 2-A. The interaction between

Pagán Santos and Agent Mercado Ruiz lasted until approximately 6:50PM. Throughout the interview process, three breaks were taken; two to use the bathroom at 2:52PM and 4:00PM, and another to eat dinner at 6:15PM. Govt. Ex. 2-A.

In the end, Pagán Santos swore out a declaration wherein he explained, in relevant part, his involvement in arranging the carjacking of the victim, Deny O'Neil Delgado-Figueroa. *See*, Gov't Ex. 2-A. Paraphrasing from his sworn declaration, Pagán Santos explained that the prior evening, that is Wednesday, January 9, 2019, Pagán Santos had received a call from Deny. *Id*. Deny had asked Pagán Santos when he would be able to pay him the money he was owed. *Id*. Pagán Santos told Deny that he had on him part of the amount owed and that he could meet Deny later that same evening to deliver it. *Id*. Deny also asked Pagán Santos to bring him "a little marijuana," which Pagán Santos also agreed to do. *Id*.

While getting the marijuana, Pagán Santos purportedly ran into some acquaintances at the boardwalk who told him that they were "looking" for an SUV. *Id*. Pagán Santos told them that he had plans to meet up with someone at the lake who drove a Corolla or a Jeep that might be of interest to them. *Id*. Pagán Santos then drove to the lake with the men from the boardwalk following in a second vehicle. *Id*. The men stopped and waited by a run-down house near a factory while Pagán Santos continued to the lake. *Id*.  The men intended to wait in that location until Deny's car passed. *Id*.

When Deny called Pagán Santos to confirm the meeting, Pagán Santos told him that he was already waiting at the lake. *Id*. Pagán Santos asked Deny whether he was coming alone and Deny confirmed that he would be alone. *Id*. After approximately 30-40 minutes, Deny finally arrived. *Id*. Pagán Santos got into Deny's car and gave him $100 and some marijuana. *Id*. As he was leaving Deny's car, Pagán Santos saw the three men approach the vehicle on foot. *Id*. They pointed guns at both Deny and Pagán Santos. *Id*. One of them, Javier Mercado Ortiz ("Javier"), ordered Pagán Santos to give him everything, and Pagán Santos replied that he did not have anything. *Id*. The men then fired a shot so that Pagán Santos would run away. *Id*.

Pagán Santos saw the men pull Deny out of the car and, through his rearview mirror saw the men fire several more shots in the direction of the woods. *Id.* And with that, Pagán Santos concluded his statement to the local authorities.

During cross examination at the suppression hearing, Agent Mercado Ruiz testified that: (1) at no time during the questioning did Pagán Santos indicate that he *did not* want to speak with him (Tr. at 32); (2) no promises were ever made to Pagán Santos in connection with whether or not criminal charges would be filed against him (*id.*); and, (3) there was no discussion of his cooperation with law enforcement. *Id.* Instead, Agent Mercado Ruiz asked Pagán Santos if he would be willing to speak with the state prosecutor about all that he had just said, to wit he said, "Yes," "there is no problem." *Id. at 32-33.* The PRPB interview of Pagán Santos was not recorded for sound or video and no one from the FBI or any other federal law enforcement agency participated or had yet been consulted about the case. *Id.* at 33.

After providing that first statement to the local authorities, Pagán Santos was placed in a holding cell at the Mayagüez station for the night while the local agents went out into the street to corroborate the information Pagán Santos had provided. *Id.* at 35. By that time, Deny's body had not yet been found by law enforcement.

## B.   Defendant's inculpatory statement made to the FBI late in the evening on Friday, January 11, 2019

The next morning between approximately 8:50AM and 9:00AM, Agent Mercado Ruiz arrived back at the police station to check on Pagán Santos. He confirmed that Pagán Santos' family had brought him breakfast earlier that morning and that he was otherwise in good health. *Id.* at 37. Agent Mercado Ruiz indicated that during the morning Deny's body had been found near the "Lago Sector" ("Lake Sector" in English) of Añasco, Puerto Rico. *Id.* at 38. Agent Mercado Ruiz then notified the state prosecutor, grabbed his gear, and set out for the crime scene. *Id.* at 37-38.

_____

After visiting the crime scene, which was about 15 minutes away from the Mayagüez police station, Agent Mercado Ruiz set out to find one of the other suspects, Javier, using the information Pagán Santos had provided the prior day. *Id.* 38. After locating Javier, Agent Mercado Ruiz placed him under arrest and took him to the precinct for questioning. *Id.*

Later that day, at around 3:40PM-3:45PM, Agent Mercado Ruiz crossed paths again with Pagán Santos at the state prosecutor's office in Mayagüez. Pagán Santos was taken to an interrogation room and interviewed by the state prosecutor. Agent Mercado Ruiz was also present during the interview with the state prosecutor.

The interview did not prove fruitful, however, and Pagán Santos was not asked to provide a sworn statement because the prosecutor felt that Pagán Santos was not telling the truth; he "kept changing [ ] versions." Tr. at 41. Agent Mercado Ruiz explained that in the interview with the state prosecutor, Pagán Santos appeared to be distancing himself from the case that was being investigated. *Id.* By that time, it was already early evening and most employees in the prosecutor's office had left for the day.

At around 6:00PM-6:30PM, the state prosecutor spoke with his supervisor and was informed that the FBI was going to take over the investigation of the carjacking. *Id.* at 42. Agent Mercado Ruiz then returned to his office at the Homicide Division with Pagán Santos and spoke directly with FBI Special Agent Diana Cancel ("SA Cancel"). After sharing his findings of the investigation with SA Cancel, Agent Mercado Ruiz transferred custody of both Pagán Santos and Javier to the FBI at around 7:30PM-8:30PM that same evening. *Id.* at 43, 96-97.

After taking custody of the evidence gathered by the PRPB, including the two suspects themselves, and signing all the necessary receipts, SA Cancel and FBI Task Force Officer José Valle Acevedo ("TFO Valle") set off in an unmarked FBI vehicle to drive Pagán Santos from Mayagüez to the FBI's field office in Aguadilla. *Id.* at 98-99. Javier, meanwhile, was transported separately by PRPB strike force officers. *Id.*

at 99. The trip from Mayagüez to Aguadilla took approximately 45 minutes and they arrived at the field office around 9:45PM that evening. *Id.*

Once they arrived at the FBI field office in Aguadilla, Pagán Santos and Javier were placed in separate interview rooms. *Id.* at 100. TFO Valle and Special Agent Hector González ("SA González") entered the room with Pagán Santos whereupon SA González proceeded to read him his *Miranda* rights in Spanish. *Id.* at 101. Then, after reading the *Miranda* rights form to himself, Pagán Santos signed the document at 10:14PM indicating that he was waiving his right to remain silent. *Id.* at 100. Two minutes later, at 10:16PM, the federal agents began their interview of Pagán Santos.

TFO Valle testified at the suppression hearing that during the interview, Pagán Santos was allowed to use the bathroom, he was offered something to eat and drink, and he never complained about the temperature in the room being too cold or too hot. *Id.* at 103. TFO Valle further testified that at no time was Pagán Santos offered special treatment for agreeing to speak with the FBI. During the interview, Pagán Santos repeated the version of events he had recounted to the PRPB with only a few slight differences. For example, (1) Pagán Santos clarified that he owed Deny money in connection with a down payment on a gun that Pagán Santos had agreed to sell to Deny but that he had sold to someone else,[3] (2) Pagán Santos said that, contrary to what he had stated earlier, he did not go to a pizza restaurant prior to the carjacking, and (3) shortly after Deny's murder, Pagán Santos sent text messages to Deny's cellphone like, "I'm going," purportedly to create an alibi for himself. *See*, Docket No. 58 at 5. The interview lasted approximately two hours, concluding close to midnight on the morning of January 12, 2019. *Id.* at 104.

Because the interview concluded so late, and because the FBI's field office in Aguadilla is more than two hours away from Guaynabo, where the federal detention center is located, the FBI agents decided to house Pagán Santos and Javier in two

---

[3] Pagán Santos owed Deny the money even though it was Deny who was the one purchasing the weapon from Pagán Santos because after Deny paid Pagán Santos a portion of the purchase price for the weapon, Pagán Santos ended up selling it to someone else. Pagán Santos therefore had to reimburse Deny for the amount he had already paid.

___

separate locations for the night. *Id.* Pagán Santos was taken to a holding cell in the Moca police station, while Javier was left in Aguadilla. *Id.* at 105. The trip from Aguadilla to Moca took approximately 50 minutes. *Id.* During the trip to Moca, Pagán Santos did not say anything further related to the investigation. *Id.*

### C.   Defendant's inculpatory statement made to the FBI on January 12, 2019, during transport from Aguadilla to Guaynabo

The next morning, Saturday, January 12, 2019, at approximately 9:30AM, TFO Valle arrived at the Moca police station to pick up Pagán Santos. *Id.* at 106. After picking him up, TFO Valle drove him in an unmarked FBI vehicle to the Aguadilla police station to pick up Javier. *Id.* After picking up Javier in Aguadilla, they drove in a convoy headed east to deliver both individuals to the Metropolitan Detention Center ("MDC"), located approximately 80 miles away in Guaynabo, Puerto Rico.

Immediately after departing the Aguadilla police station, Pagán Santos indicated to the agents that he wanted to correct a statement he had made the day before to FBI SA González. *Id.* at 107. TFO Valle immediately stopped Pagán Santos from speaking any further, read him his *Miranda* rights again, and provided him with another copy of the *Miranda* rights form to read and sign, which Pagán Santos did. *Id.* The time written on this third *Miranda* rights form was "9:40AM," which TFO Valle testified was both the time that Pagán Santos signed the document and the time he began taking Pagán Santos' statement.

Pagán Santos spoke for approximately half an hour, during which time he reiterated that he and Javier had planned to carjack Deny and that he had left the area once the gunfire began. Docket No. 58 at 15. He added that he told Javier to release Deny in another town to delay the police investigation once the robbery was reported. *Id.*

During that same trip to Guaynabo, Pagán Santos also signed a consent-to-search form for his cellphone. Then, around 11:00AM, the FBI convoy arrived at MDC where Pagán Santos and Javier were detained pending further legal proceedings. *Id.*

Later that evening, Saturday, January 12, 2019, at 8:25PM, a federal Magistrate Judge authorized a criminal complaint and an arrest warrant for Pagán Santos based, in part, on the confession he had given to PRPB agents. *See,* Docket Nos. 3 & 3-1.

Pagán Santos was charged with one count of aiding and abetting a carjacking, in violation of Title 18, *United States Code*, Section 2119, and one count of aiding and abetting in the commission of a crime of violence with a discharged firearm, in violation of Title 18, *United States Code*, Section 924(c)(1)(A)(iii).

### D. Defendant's inculpatory statement made to the FBI on Monday, January 14, 2019, during transport from MDC to the Federal Courthouse[4]

On Monday, January 14, 2019, FBI agents picked up Pagán Santos at MDC to transport him to the federal courthouse in Hato Rey for booking and processing at the FBI's headquarters, to meet with Pretrial Services, and to appear before the magistrate judge for an initial appearance. En route to the courthouse, however, Pagán Santos again told the FBI agents that he wanted to clarify an earlier statement he had made. Accordingly, after entering the Federal Office Building and before taking his revised statement, at around 10:45AM, Pagán Santos was once again provided a *Miranda* rights form, which he reviewed and signed, thereby waiving his right to remain silent for a fourth time. *See*, Docket 56-1 at 10.

During this fourth statement, the third one made to the FBI, Pagán Santos again reiterated his earlier statements given to both the PRPB and the FBI. Docket No. 58 at 18-21. He did however add some details regarding the events that occurred *after* Deny's murder. For example, Pagán Santos indicated that he returned to the scene after he heard gunshots (i*d.* at 20); that he saw the victim's body; and, that he had asked Javier why he killed Deny and Javier responded that Deny "could have identified him." *Id.* Pagán Santos also admitted that, later that evening, he had in

---

[4] For completeness and continuity, the Court includes a full explanation of the facts related to this third statement made to the FBI even though the government indicated it will not be using it in its case-in-chief and the Court will not be analyzing it for its admissibility.

_____

fact seen Javier burn the victim's car, and that he had given Javier a lift before returning home himself. *Id.*

      After Pagán Santos made these additional statements, the FBI agents escorted him to Pretrial Services around 12:20PM. The magistrate judge on duty then held an initial appearance for Pagán Santos at around 4:00PM. *See*, Docket No. 6.

      On February 1, 2019, the grand jury returned an indictment against Pagán Santos charging him with one count of aiding and abetting in a carjacking resulting in death, in violation of Title 18, *United States Code*, Sections 2119(3) and 2, and one count of aiding and abetting in the use and carry of a firearm during and in relation to a crime of violence causing murder, in violation of Title 18, *United States Code*, Sections 924(c)(a)(A) and 924(j)((1) and 2. *See*, Docket No. 16.

## II.   <u>LEGAL DISCUSSION</u>

      In his Motion to Suppress, the defendant raises two general contentions: first, he claims that all three sets of inculpatory statements made to the FBI while he was detained should be suppressed because they were obtained following an unreasonable delay in presentment in violation of the *McNabb-Mallory* rule and Rule 5 of the Federal Rules of Criminal Procedure. More specifically, he contends that the statements were made outside of the 6-hour window for prompt presentment before a magistrate judge, pursuant to Title 18, *United States Code*, Section 3501(c), and that there was no reasonable justification to excuse the delay. Second, he claims that *all* the statements he made to law enforcement, including those made to the PRPB immediately after his arrest, should be suppressed because they were involuntary and coerced in violation of his Fifth and Sixth Amendment Rights.

      Although the defendant presented the legal issues in the order described above, and the government responded in like order, because the voluntariness of his statements under constitutional standards is a pivotal threshold question that applies to all the statements the defendant made to law enforcement, the Court will

first address the voluntariness of the statements, and then it will discuss the specific *McNabb-Mallory*-Rule 5 prompt presentment issues.

### A. Defendant's contention that his statements made to both the PRPB and the FBI were involuntary and coerced in violation of the Fifth and Sixth Amendments

The Supreme Court's longstanding precedent dealing with the admissibility of confessions still to date has not yielded a talismanic definition of "voluntariness." *Schneckloth v. Bustamonte*, 412 U.S. 218, 223 (1973). Indeed, "the notion of voluntariness," Justice Frankfurter once wrote, "is itself an amphibian." *Id.* (citing *Culombe v. Connecticut*, 367 U.S. 568, 604—605 (1961). "It cannot be taken literally to mean a 'knowing' choice." *Id.* "Except where a person is unconscious or drugged or otherwise lacks capacity for conscious choice, all incriminating statements—even those made under brutal treatment—are 'voluntary' in the sense of representing a choice of alternatives." *Schneckloth*, at 224.

Instead, 'voluntariness' has reflected an accommodation of the complex of values implicated in police questioning of a suspect. *Id.* At one end of the spectrum is the acknowledged need for police questioning as a tool for the effective enforcement of criminal laws. *Schneckloth*, at 224-25 (citing *Culombe v. Connecticut*, supra, at 578—580.) Without such investigation, those who were innocent might be falsely accused, those who were guilty might wholly escape prosecution, and many crimes would go unsolved. *Id.* In short, the security of all would be diminished. *Schneckloth*, at 225 (citing *Haynes v. Washington*, 373 U.S. 503, 515 (1963). At the other end of the spectrum is the set of values reflecting society's deeply felt belief that the criminal law cannot be used as an instrument of unfairness, and that the possibility of unfair and even brutal police tactics poses a real and serious threat to civilized notions of justice. "[I]n cases involving involuntary confessions, this Court enforces the strongly felt attitude of our society that important human values are sacrificed where an agency of the government, in the course of securing a conviction, wrings a confession out of an accused against his will." *Schneckloth*, at 225 ((quoting *Blackburn v.*

_____

*Alabama*, 361 U.S. 199, 206—207 (1960)) (citing *Culombe v. Connecticut*, supra, 367 U.S., at 581—584) (citing *Chambers v. Florida*, 309 U.S. 227, 235—238 (1940))).

In *Schneckloth v. Bustamonte*, the Court stressed that its longstanding precedent reflects a frank recognition that "the Constitution requires the sacrifice of neither security nor liberty." *Id.* at 225. Indeed, the Due Process Clause does not mandate that the police forgo all questioning, nor that they be given carte blanche to extract what they can from a suspect. *Id.* "The ultimate test remains that which has been the only clearly established test in Anglo-American courts for two hundred years: the test of voluntariness." *Id.* In other words, the ultimate question is "whether the confession is the product of an essentially free and unconstrained choice by its maker?" "If it is, if he has willed to confess, it may be used against him. If it is not, if his will has been overborne and his capacity for self-determination critically impaired, the use of his confession offends due process." *Id.* at 225-226 (quoting *Culombe v. Connecticut*, supra, 367 U.S. at 602).

When a confession challenged as involuntary is sought to be used against a criminal defendant . . . he is entitled to a reliable and clear-cut determination that the confession was in fact voluntarily rendered. *Lego v. Twomey*, 404 U.S. 477, 489 (1972). Thus, the prosecution must prove at least by a preponderance of the evidence that the confession was voluntary. *Id.*

In determining whether a defendant's will was overborne by law enforcement in a particular case, courts must consider the totality of the surrounding circumstances—including both the characteristics of the accused and the details of the interrogation. *Schneckloth*, at 226. In this case, the defendant contends that his will was overborne by law enforcement when he provided all four of his inculpatory statements and that his statements were thus made involuntarily. In support of this argument, Pagán Santos claims that: (1) he was 18 years old at the time that he made his statements, (2) he had not previously been subject to a custodial interrogation, (3) he was in custody when he made his inculpatory statements, (4) the interviews with law enforcement were not recorded, (5) he was interviewed without the presence

_____

of a lawyer or a friend, and (6) there was an unreasonable delay in presentment.[5] Docket No. 50 at pp.13-20. Pagán Santos also mentions an additional seventh factor, namely, that he may have been offered favorable treatment if he agreed to speak with law enforcement, or conversely, he may have been threatened by law enforcement if he refused to speak.

In response, the government submits that it does not dispute the existence of points 1 through 5 above but nevertheless argues that none of those points, when taken individually or together, amount to coercion such that defendant's incriminatory statements to law enforcement were rendered involuntary. Indeed, the government submits that to hold that such conditions, *on their face*, constitute coercion, as the defendant asks the Court to hold, "would require [the] suppression of *any* statement [made] during an unrecorded custodial interrogation of an 18-year-old without a criminal record and without the presence of his parents or a lawyer." Docket No. 56 at 25. (Emphasis added). The Court agrees with the government that such a holding would be a substantial overreach and is simply not supported by the facts of this case.

In his Motion to Suppress, the defendant dutifully discusses each of the abovementioned characteristics in general terms and explains how each characteristic might hypothetically affect an individual's willingness to consent. What he does not do, however, is explain how any of those characteristics render the facts of this case idiosyncratic in that their mere existence, without more, supports a claim of undue influence or how their existence coerced him into giving incriminatory statements when he would not have done so otherwise. For example, with respect to point number 1 above, having to do with defendant's age, other than noting that he was 18 years old at the time he was interviewed by law enforcement, highlighting his numerical age alone provides the Court with no information to support defendant's argument that he was coerced into providing the inculpatory statements to law

_____

[5] Point number 6, whether there was unreasonable delay in presentment, will be discussed in detail in Section B *infra*.

_____

enforcement due to his youth. First of all, in this jurisdiction, an 18-year old is considered an adult. Furthermore, for all the Court knows, the defendant could be a prodigy notwithstanding his numerical age. Most importantly, however, the defendant failed to point to a single fact demonstrating that his age in any way affected or impaired his ability to knowingly and voluntarily consent to giving multiple inculpatory statements to law enforcement.

Similarly, with respect to point number 2–defendant's experience with custodial interrogations–while it may be true that Pagán Santos had no prior criminal record and perhaps had no prior experience in dealing with the police, that fact alone does not support a contention that the police took advantage of his inexperience in this case and somehow coerced Pagán Santos into providing multiple inculpatory statements. The evidence presented during the hearing demonstrated that all agents dutifully complied with the obligation to advise Pagán Santos of the rights he would be waiving by making the statements, and that he understood said warnings. This factor does not support a claim of coercion.

With respect to points 3-5, namely, that Pagán Santos was in custody at the time of each interview, his interviews were not recorded, and he had no lawyer or parent present during the interviews, these are all facts that, even if true, are fully covered by the multiple *Miranda* waivers that Pagán Santos signed over the course of several days. And, like points 1 and 2 above, the defendant fails to explain how being in custody, not having his interviews recorded, and not having a lawyer or parent present, contributed to his will being overborne by law enforcement such that the voluntariness of his statements can be called into question. Once again, nothing in the evidence presented regarding these factors brings into question the voluntariness of his statements.

And finally, with respect to point number 7, namely, that potential offers of favorable treatment were made to defendant if he agreed to speak with law enforcement, or threats were made if he refused to speak, the Court notes that there is simply no evidence in the record to support such a contention. Indeed, the evidence

_____

strongly supports the opposite conclusion, that *no* offers *nor* threats were made to induce the defendant to make any statement to law enforcement.[6] Accordingly, the Court finds that any mention of offers to testify or threats if defendant refused to testify is irrelevant here because there is simply no evidence to support it.

In the end, given the complete lack of discussion as to *how* any of the characteristics identified in points 1-5 above specifically negated this defendant's will to act voluntarily, the Court can only assume that the defendant is asking the Court to make a *per se* ruling that the joint presence of these characteristics somehow vitiated the defendant's will. Such a request is more than the Court is willing to accede to.

If, on the other hand, the defendant is not asking this Court for a *per se* ruling that the mere presence of these characteristics constitutes coercion sufficient to vitiate the defendant's will to act voluntarily, then the dearth of any discussion in his Motion to Suppress as to how those characteristics specifically affected his will to act voluntarily in this case necessarily means that the defendant is expecting the Court to act as a mind-reader having to formulate the argument on his behalf. As the First Circuit mentioned in *United States v. Zannino*, 895 F.2d 1, 17 (1990), issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. *See, e.g., Brown v. Trustees of Boston Univ.*, 891 F.2d 337, 353 (1st Cir. 1989); *Leer v. Murphy*, 844 F.2d 628, 634 (9th Cir. 1988). "It is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put

---

[6] The undisputed evidence in the record shows that, prior to the January 10, 2019, interview with PRPB agents, the defendant signed the *Miranda* rights form wherein he specifically acknowledged that "[t]he waiver of . . . rights has been without coercion, intimidation, violence, *pressure or promises*." Docket No. 123-2 Govt. Ex 1 A. (Emphasis added). Moreover, in response to questions on cross examination during the suppression hearing, Agent Mercado Ruiz testified that with respect to his interview by PRPB agents on Thursday, January 10, 2019, no promises were ever made to Pagán Santos in connection with whether or not criminal charges would be filed against him (Tr. at 32); and there was no discussion of his cooperation with law enforcement. *Id.* Furthermore, TFO Valle testified that with respect to defendant's interview by FBI agents on Friday, January 11, 2019, at no time was Pagán Santos offered special treatment for agreeing to speak with the FBI.

_____

flesh on its bones." "Judges are not expected to be mind-readers. Consequently, a litigant has an obligation 'to spell out its arguments squarely and distinctly,' or else forever hold its peace." *Zannino*, at 17 (quoting, *Rivera–Gomez v. de Castro*, 843 F.2d 631, 635 (1st Cir. 1988) (quoting *Paterson–Leitch Co. v. Massachusetts Municipal Wholesale Elec. Co.,* 840 F.2d 985, 990 (1st Cir. 1988)).

Here, the defendant has simply thrown out a laundry list of factors that he believes should be considered by the Court when analyzing the voluntariness of his incriminating statements. But he fails to explain *how* any of those factors, individually or jointly, served to vitiate his will and allow for law enforcement agents to coerce him into making the incriminating statements he now purports to challenge. The defendant's complete lack of well-developed argumentation is fatal to his cause as any such argument is considered to have been waived.

The Court notes additionally that nowhere in his Motion to Suppress does the defendant discuss the substance, applicability, or relevance of the Fifth and Sixth Amendments to his request for a remedy. Other than mention the words "Fifth and Sixth Amendments" in a footnote, a parenthetical, a section heading and in one conclusory sentence on the last page of his Motion to Suppress, the defendant fails miserably to elaborate on what protections those amendments provide or how those amendments are even applicable to the facts of this case. The use of the words alone, without any corresponding explanation as to their applicability to this case, is yet another example of the defendant expecting the Court to read his mind and develop the arguments for him. That is not the role of the Court. Indeed, the defendant's abject failure to discuss the sum and substance of the Fifth and Sixth Amendments is another reason why the Court considers defendant's arguments regarding the same to have been waived under *United States v. Zannino*, 895 F.2d at 17.

Notwithstanding such waiver, the Court recognizes that the issue of voluntariness permeates all aspects of this case. Indeed, it plays a pivotal role in the *McNabb-Mallory*-Rule 5 prompt presentment analysis to be discussed later in the next section. In addition, the Court understands that the burden to prove that a

*United States v. Andrés Noel Pagán-Santos,*
Crim. No. 19-068 (PAD)

Page 17

confession was voluntary falls on the prosecution to demonstrate by preponderance of the evidence. For that reason, the Court must nevertheless determine whether the prosecution has met its factual burden to demonstrate that the defendant's incriminating statements made to the PRPB on Thursday, January 10, 2019, and the incriminating statements made to the FBI on Friday, January 11, 2019, and Saturday, January 12, 2019, were in fact voluntary.

> 1.   <u>Voluntariness of the defendant's incriminating statements made to PRPB agents on Thursday, January 10, 2019</u>

During the suppression hearing, the government presented the live testimony of three law enforcement officers, PRPB Agent Mercado Ruiz, FBI Task Force Officer Ramón Soto Rodríguez, and FBI TFO José Valle. The government also presented some five exhibits and one joint exhibit. The defendant, on the other hand, except for the one joint exhibit, presented no evidence. The Court therefore credits the evidence presented during the suppression hearing as largely uncontroverted.

With respect to the voluntariness of defendant's statement made to the PRPB agents on Thursday, January 10, 2019, the evidence showed that the defendant appeared voluntarily at the police station after his mother had told him that the police were interested in speaking with him. Pagán Santos was not necessarily a target of the investigation and was being questioned merely because Deny's girlfriend told police that he was the last person to see Deny. When his interview started, he was not provided with an Advice of Rights Form because he was not under arrest and was not in police custody.

After being placed in an interview room, Pagán Santos began to recount his participation in a purported "plan to steal a vehicle." Upon realizing that Pagán Santos was about to incriminate himself, Agent Mercado Ruiz immediately stopped the interview to advise Pagán Santos of his *Miranda* rights. He handed Pagán Santos a document that explained his rights and asked Pagán Santos to review it and place his initials next to each specific warning provided, which he did. Pagán Santos checked the box indicating that "he was exercising his right to read the form himself,"

_____

and also checked the box indicating that, '[he] understood the rights that those warnings bestow upon [him] and [he] **voluntarily waive[s]** the same with the knowledge that [he] can stop being questioned and/or invoke [his] right to an attorney at any time." (Emphasis in original). In filling out the form, he also acknowledged that the "waiver of these rights has been without *coercion, intimidation, violence, pressure or promises*." (Emphasis added.)

Agent Mercado Ruiz testified that when Pagán Santos was asked if he understood the warnings and whether he wanted a lawyer present, he responded by saying, "No, No, I don't want a lawyer."

After finishing the interview, Agent Mercado Ruiz asked Pagán Santos if he would be willing to write down everything he had just said. To wit Pagán Santos said, "yes, no problem." Agent Mercado Ruiz handed Pagán Santos a special form and Pagán Santos wrote down everything he had previously stated to Agent Mercado Ruiz. Throughout the interview, which lasted approximately four hours, Pagán Santos was given three breaks; two to use the bathroom at 2:52PM and 4:00PM, and another to eat dinner at 6:15PM.

There is no indication that Pagán Santos' interview was anything but voluntary. His age did not seem to play any role in his decision to speak voluntarily with the PRPB agents or to give the incriminating statement to law enforcement. In addition, there is no indication that the PRPB agents took advantage of Pagán Santos' inexperience with custodial interrogations and the evidence demonstrates that Pagán Santos knowingly and voluntarily waived his right to consult with or have a lawyer present during the questioning.

In sum, the Court finds that the government has demonstrated by a preponderance of the evidence that the statements provided during the interview of Pagán Santos conducted by PRPB agents on Thursday, January 10, 2019, were given knowingly, voluntarily and without coercion.

_____

2.     <u>Voluntariness of the defendant's incriminating statements made
to FBI agents on Friday, January 11, 2019</u>

On Friday, January 11, 2019, Pagán Santos agreed to be interviewed by the
state prosecutor, together with PRPB agent Mercado Ruiz, purportedly to recount
that which he had told PRPB agents the day before regarding his participation in the
"plan to steal the vehicle." After spending some time discussing the facts of the case
with the prosecutor, the prosecutor decided not to have Pagán Santos swear-out an
affidavit because he kept changing his story. He appeared to be minimizing his
participation in the carjacking. The Court notes that notwithstanding defendant's
protestations about being only 18 years old and having no experience with custodial
investigations, his ability to minimize his participation during an interview with the
state prosecutor and the lead investigator, demonstrates a level of savviness that
undermines any inference that he was coerced by law enforcement.[7]

Later that evening, after the FBI had officially assumed jurisdiction over the
investigation into the carjacking, Pagán Santos was relocated to the FBI filed office
in Aguadilla, Puerto Rico. Pagán Santos was placed in an interview room separate
from Javier and SA González proceeded to read him his *Miranda* rights in Spanish.
This was the second time that Pagán Santos was read his *Miranda* rights by law
enforcement. After reading the *Miranda* rights form to himself, Pagán Santos signed
the document at 10:14PM indicating that he was waiving his right to remain silent.

TFO Valle testified at the suppression hearing that during the interview
Pagán Santos was allowed to use the bathroom, he was offered something to eat and
drink, and he never complained about the temperature in the room being too cold or
too hot. *Id*. at 103. TFO Valle further testified that at no time was Pagán Santos
offered special treatment for agreeing to speak with the FBI. During the interview,
Pagán Santos repeated the version of events he had recounted to the PRPB and even
clarified a few details from what he had previously mentioned to the PRPB agents.

_____

[7] Though no incriminatory statement resulted from his discussions with the state prosecutor, the
Court notes the relevance of defendant's sophisticated and self-serving conduct to a totality of the
circumstances analysis.

The Court finds that the government has demonstrated by a preponderance of the evidence that Pagán Santos' statement to FBI agents on Friday, January 11, 2019, was given knowingly, voluntarily and without coercion.

       3.    <u>Voluntariness of the defendant's incriminating statements made to FBI agents on Saturday, January 12, 2019</u>

On Saturday, January 12, 2019, FBI TFO Valle picked up Pagán Santos from the Aguadilla police station around 9:30AM to take him to MDC. At approximately 9:40AM, Pagán Santos informed TFO Valle that he wanted to correct a statement he had made the day before to SA González. TFO Valle immediately stopped Pagán Santos from speaking any further, read him his *Miranda* rights, and provided him with another copy of the *Miranda* Advice of Rights Form to read and sign, which he did. To be sure, this was the third time that Pagán Santos had been read and explained his *Miranda* rights in as many days.

Pagán spoke with TFO Valle for approximately half an hour and largely reiterated that which he had previously mentioned to agents before. He nevertheless added the self-serving clarifications that, 1) he was involved in the carjacking but left once the shooting began, and 2) his idea was to release the victim in another town (as opposed to killing him) to delay the police investigation once the robbery was reported. Pagán Santos also signed a consent-to-search form for his cellphone.

The Court finds that the government has demonstrated by preponderance of the evidence that Pagán Santos' statement made en route to MDC on Saturday, January 12, 2019, was given knowingly, voluntarily and without coercion.

_____

**B.    Defendant's contention that his incriminatory statements to the FBI should be suppressed because they were made outside the 6-hour window provided for by the *McNabb-Mallory* prompt presentment rule and Rule 5 of the Federal Rules of Criminal Procedure, and that there was no reasonable justification to excuse the delay**

      1.   <u>Development of the *McNabb-Mallory* rule through the years</u>

          a.    *The prompt presentment rule*

Historically, the common law obligated an arresting officer to bring his prisoner before a magistrate as soon as he reasonably could. *Corley v. U.S.*, 556 U.S. 303, 306 (2009) (citing *County of Riverside v. McLaughlin*, 500 U.S. 44, 61-62 (1991) (Scalia, J., dissenting)). This "presentment" requirement tended to prevent secret detentions, served to inform a suspect of the charges against him, and was the law in nearly every American State and the National Government. *Corely*, at 306 (citing *id.*, at 60–61; *McNabb v. United States*, 318 U.S. 332, 342, and n.7 (1943). The standards on what constituted a reasonable time for detention before presentment, however, were varied and vague.

For that reason, in 1943, the Supreme Court addressed the question of how to enforce various federal statutes codifying the presentment rule. *Corley*, at 306 (citing *McNabb*, at 342). In *McNabb v. United States*, federal agents flouted the presentment requirement by interrogating murder suspects for days on end before bringing them to a magistrate judge, and then only after the defendants had given the confessions that served to convict them. 318 U.S., at 334–338, 344–345. The Court held those confessions inadmissible because they were obtained during an unreasonable delay in presentment. *McNabb*, at 345. *See also*, *Corley*, at 307.

Shortly after the pivotal *McNabb* decision, Congress adopted Rule 5(a) of the Federal Rules of Criminal Procedure to "pull the several statutory presentment provisions together in one place." *Corley*, at 307. Rule 5(a), which has remained virtually unchanged, provides that a "person making an arrest within the United States must take the defendant '*without unnecessary delay*' before a

_____

magistrate judge, or before a state or local Judicial officer as 5(c) provides, unless a statute provides otherwise." Fed. R. Crim. P. 5(a) (2014). (Emphasis added).

In 1957, the Court again addressed the issue of presentment delay, and applied Rule 5(a)'s presentment provision, in the case of *Mallory v. United States*, 354 U.S. 449 (1957). In *Mallory*, the Court held that a confession given seven hours after arrest was inadmissible for "unnecessary delay" in presenting the suspect to a magistrate judge where the police questioned the suspect for hours "within the vicinity of numerous committing magistrates." The *Mallory* court stressed that "delay for the purpose of interrogation is the *epitome* of 'unnecessary delay.'" *Corley*, at 308. (Emphasis added).

This line of presentment cases eventually became known as the "*McNabb-Mallory* rule," a judicial doctrine pursuant to which confessions "made during periods of detention that violat[e] the prompt presentment requirement of Rule 5(a)" are rendered inadmissible evidence at trial. *Corley*, at 309, (quoting *United States v. Alvarez-Sánchez*, 511 U.S. 350, 354 (1994)).

> *b.     Section 3501 – Statutory provisions*

In 1968, largely in response to the Court's decision in *Miranda v. Arizona*, 384 U.S. 436 (1966), and based on the application of the *McNabb-Mallory* rule by some federal courts, Congress enacted 18 U.S.C. § 3501.[8] Subsections (a) and (b) of § 3501

_____

[8] Title 18, *United States Code*, Sections 3501(a) and (b) provide as follows:

> (a) In any criminal prosecution brought by the United States or by the District of Columbia, a confession, as defined in subsection (e) hereof, shall be admissible in evidence if it is voluntarily given. Before such confession is received in evidence, the trial judge shall, out of the presence of the jury, determine any issue as to voluntariness. If the trial judge determines that the confession was voluntarily made it shall be admitted in evidence and the trial judge shall permit the jury to hear relevant evidence on the issue of voluntariness and shall instruct the jury to give such weight to the confession as the jury feels it deserves under all the circumstances.

> (b) The trial judge in determining the issue of voluntariness shall take into consideration all the circumstances surrounding the giving of the confession, including (1) the time elapsing between arrest and arraignment of the defendant making the confession, if it was made

*United States v. Andrés Noel Pagán-Santos,*
Crim. No. 19-068 (PAD)

Page 23

were meant to codify *Miranda*. *Corely*, at 310 (citing *Dickerson v. United States*, 530 U.S. 428, 435–437 (2000). Subsection (a) provides, in relevant part, that "[i]n any criminal prosecution brought by the United States . . ., a confession . . . shall be admissible in evidence if it is voluntarily given," while subsection (b) lists several considerations for courts to address in assessing voluntariness. Subsection (c), meanwhile, codified the *McNabb-Mallory* rule, and provides that in any federal prosecution, "a confession made . . . by . . . a defendant therein, while such person was under arrest . . ., shall not be inadmissible solely because of delay in bringing such person before a magistrate judge . . . if such confession is found by the trial judge to have been made voluntarily . . . and if such confession was made . . . within six hours [of arrest];" the 6-hour time limit is extended when further delay is "reasonable considering the means of transportation and the distance to be traveled to the nearest available [magistrate judge]."[9]

---

after arrest and before arraignment, (2) whether such defendant knew the nature of the offense with which he was charged or of which he was suspected at the time of making the confession, (3) whether or not such defendant was advised or knew that he was not required to make any statement and that any such statement could be used against him, (4) whether or not such defendant had been advised prior to questioning of his right to the assistance of counsel; and (5) whether or not such defendant was without the assistance of counsel when questioned and when giving such confession.

The presence or absence of any of the above-mentioned factors to be taken into consideration by the judge need not be conclusive on the issue of voluntariness of the confession.

[9] Title 18, *United States Code*, Section 3501(c) provides as follows:

(c) In any criminal prosecution by the United States or by the District of Columbia, a confession made or given by a person who is a defendant therein, while such person was under arrest or other detention in the custody of any law-enforcement officer or law-enforcement agency, shall not be inadmissible solely because of delay in bringing such person before a magistrate judge or other officer empowered to commit persons charged with offenses against the laws of the United States or of the District of Columbia if such confession is found by the trial judge to have been made voluntarily and if the weight to be given the confession is left to the jury and if such confession was made or given by such person within six hours immediately following his arrest or

_____

c.      *Section 3501 modified McNabb-Mallory without*
         *supplanting it*

In 2009, the Supreme Court grappled with the issue of whether Congress
intended § 3501(a) to sweep *McNabb-Mallory's* exclusionary rule aside entirely, or
merely meant § 3501(c) to provide immunization to voluntary confessions given
within six hours of a suspect's arrest.

In *Corley*, the petitioner, Johnnie Corley, was suspected of robbing a bank in
Norristown, Pennsylvania. After federal agents learned that Corley was subject to
arrest on an unrelated local matter, some federal and state officers went together to
execute the state warrant on September 17, 2003, and found him just as he was
pulling out of a driveway in his car. Corley nearly ran over one officer, then jumped
out of the car, pushed the officer down, and ran. The agents gave chase and caught
and arrested him for assaulting a federal officer. The arrest occurred about 8:00AM.

FBI agents first kept Corley at a local police station while they questioned
residents near the place he was captured. Around 11:45AM, they took him to a
Philadelphia hospital to treat a minor cut on his hand that he got during the chase.
At 3:30PM, the agents took him from the hospital to the Philadelphia FBI office and
told him that he was a suspect in the Norristown bank robbery. Though the office was
in the same building as the chambers of the nearest magistrate judge, the agents did
not bring Corley before a magistrate judge, but questioned him instead, in hopes of
getting a confession. App. 68–69, 83, 138–139.

The agents' repeated arguments sold Corley on the benefits of cooperating with
the government, and he signed a form waiving his *Miranda* rights. At 5:27PM, some
9.5 hours after his arrest, Corley began an oral confession that he robbed the bank,
and spoke on in this vein until about 6:30PM, when agents asked him to put it all

_____

other detention: Provided, That the time limitation contained in this
subsection shall not apply in any case in which the delay in bringing
such person before such magistrate judge or other officer beyond such
six-hour period is found by the trial judge to be reasonable considering
the means of transportation and the distance to be traveled to the
nearest available such magistrate judge or other officer.

down in writing. Corley said he was tired and wanted a break, so the agents decided
to hold him overnight and take the written statement the next morning. At 10:30AM
the next day, they began the interrogation again, which ended when Corley signed a
written confession. He was finally presented to a magistrate judge at 1:30PM that
day, some 29.5 hours after his arrest.

Corley was charged with armed bank robbery, in violation of 18 U.S.C.
§§ 2113(a) & (d), conspiracy to commit armed bank robbery, in violation of 18 U.S.C.
§ 371, and using a firearm in furtherance of a crime of violence, in violation of
18 U.S.C. § 924(c). When he moved to suppress his oral and written confessions under
Rule 5(a) and *McNabb-Mallory*, the District Court denied the motion, with the
explanation that the time Corley was receiving medical treatment should be excluded
from the delay, and that the oral confession was thus given within the 6-hour window
of § 3501(c). Crim. No. 03–775 (ED Pa., May 10, 2004), App. 97. The District Court
also held Corley's written confession admissible, reasoning that "a break from
interrogation requested by an arrestee who has already begun his confession does not
constitute unreasonable delay under Rule 5(a)." *Id*. at 97–98. Corley was convicted of
conspiracy and armed robbery but acquitted of using a firearm during a crime of
violence. 500 F.3d, at 212–213.

A divided panel of the Court of Appeals for the Third Circuit affirmed the
conviction, though its rationale for rejecting Corley's Rule 5(a) argument was
different from the district court's. The panel majority considered itself bound by
Circuit precedent to the effect that § 3501 entirely abrogated the *McNabb–Mallory*
rule and replaced it with a pure voluntariness test. On certiorari, after an exhaustive
discussion of the history behind the *McNabb-Mallory* rule and Section 3501, the
Court held that § 3501 modified *McNabb-Mallory* without supplanting it. The Court
explained that,

> [u]nder the rule as revised by § 3501(c), a district court with
> a suppression claim must find whether the defendant
> confessed within six hours of arrest (unless a longer delay
> was "reasonable considering the means of transportation

and the distance to be traveled to the nearest available [magistrate judge]"). If the confession came within that period, it is admissible, subject to the other Rules of Evidence, so long as it was "made voluntarily and . . . the weight to be given [it] is left to the jury." *Ibid*. If the confession occurred before presentment and beyond six hours, however, the court must decide whether delaying that long was unreasonable or unnecessary under the *McNabb-Mallory* cases, and if it was, the confession is to be suppressed.

*Id.* at 322. In the end, the Court remanded the case for, among other things, consideration of the justifiability of any delay in presentment beyond the six hours. *Id.* at 323.

In this case, the Court understands that it must conduct its presentment analysis as delineated in *Corley*; first determine whether any of the statements being challenged occurred within 6 hours of defendant's arrest, and if not, whether there is a reasonable excuse for the delay in presentment.

It bears noting, however, that when ruling on a motion to suppress based on the *McNabb-Mallory* rule, the determination by the court is whether there was an unreasonable delay *at the time the confession was made. Upshaw v. United States*, 335 U.S. 410, 413 (1948) (citing *United States v. Mitchell*, 322 U.S. 65, 70 (1944). That is to say that a subsequent illegal detention does not retroactively change the circumstances under which the suspect made his confession. *Id.* This is so because a voluntary and admissible self-incriminating statement cannot be said to have been procured by subsequent wrongful detention. *Mitchell*, 322 U.S. at 70. *See also, United States v. Casillas*, 792 F.3d 929, 931 (8th Cir. 2015) (explaining that there is no violation of Rule 5 or *McNabb-Mallory* if the confession is made within six hours of arrest and is otherwise voluntary, even if the later presentment is unreasonably delayed). This concept is particularly important in a case like this one where multiple statements are being challenged, each of which was given at different times throughout defendant's detention.

_____

      2.      <u>Pagán Santos' attack on the inculpatory statement made to the
FBI late in the evening on Friday, January 11, 2019, based on the
purported failure to promptly present him before a magistrate
judge</u>

           *a.    Applicability of the 6-hour window under the McNabb-
Mallory rule, Rule 5 and Section 3501(c), and the
determination of when defendant was placed under "federal
custody"*

To be sure, the defendant is not challenging the inculpatory statement he made
to the PRPB immediately after his arrest, on Thursday, January 10, 2019, for
violating prompt presentment requirements. That statement was undeniably made
within six hours of his arrest by local authorities.[10] Instead, the first statement
defendant challenges on prompt presentment grounds is the confession made to the
FBI late in the evening on Friday, January 11, 2019. The defendant argues that this
statement to the FBI, which began at 10:16PM on Friday evening, violated the
*McNabb-Mallory* rule because it was made some 31.5 hours[11] after his arrest by
PRPB agents.

The government responds by arguing that the six-hour window under
the *McNabb-Mallory* rule does not apply to prisoners who are not in federal custody
(referred to herein as the "federal custody rule"). *United States v. Alvarez-Sánchez*,
511 U.S. 350, 358 (1994) ("If . . . the person is arrested and held on state charges,
§ 3501(c) does not apply, and the safe harbor is not implicated. This is true even if
the arresting officers (who, when the arrest is for a violation of state law, almost
certainly will be agents of the State or one of its subdivisions) believe or have cause
to believe that the person may have also violated federal law.")[12]

---

[10] Additionally, the provisions of §3501(c) are not triggered when a person is arrested and held solely
on state charges by state or local authorities. *See, United States v. Alvarez-Sánchez*, 511 U.S. 350
(1994).

[11] The 31.5 hours is counted from Pagán Santos' arrest by PRPB at approximately 3:00PM on
Thursday, January 10, 2019, until he gave his statement to the FBI at approximately 10:16PM on
January 11, 2019.

[12] *See also*, *United States v. Williams*, 612 F.3d 417, 422-23 (6th Cir. 2010) (section 3501(c) "regulates
federal prosecutions and confessions, not confessions made in state custody"); *United States v. Smith*,

*United States v. Andrés Noel Pagán-Santos,*
Crim. No. 19-068 (PAD)

Page 28

_____

Here, the defendant attempts to circumvent this legal and factual hurdle by arguing that because Puerto Rico and the United States are considered a single sovereign for purposes of the Double Jeopardy Clause, an arrest made by PRPB agents is synonymous with an arrest made by the FBI, and vice versa. He claims, thereby, that the transfer of custody of the defendant on Friday, January 11, 2019, from the PRPB to the FBI, ergo his "federal arrest," was of no legal consequence, because he was already under federal custody when he was arrested by PRPB agents the day before. The Court finds this position neither supported by the Supreme Court's decision in *Puerto Rico v. Sánchez Valle*, 136 S. Ct. 1863 (2016), nor by longstanding First Circuit precedent.

The defendant further argues that, irrespective of the Court's holding in *Sánchez Valle*, there nevertheless exists a special "working arrangement" between the United States Attorney's Office ("USAO-PR") and the Puerto Rico Department of Justice ("PRDOJ") such that a co-agency-type relationship was created when the agencies entered into a Memorandum of Understanding in the year 2010 (the "MOU"). The defendant contends that, pursuant to the MOU, PRPB agents who arrested the defendant on Thursday, January 10, 2019, acted as agents of the FBI, and therefore "it is reasonable to impute the agent's knowledge of pertinent facts to his principal." Docket No. 50, at 11-12. The Court disagrees.

_____

606 F.3d 1270, 1278 (10th Cir. 2010) ("Where a person is under arrest on solely non-federal charges, neither the prompt-presentment rule nor the safe-harbor period are relevant even when the arresting officers believe the person also may have violated federal law"); *United States v. Percy*, 250 F.3d 720 (9th Cir. 2001), certiorari denied 122 S. Ct. 493 ("Rule 5(a) does not apply where police sergeant arrested defendant on tribal, rather than federal, warrant; thus, absent evidence of collusion between federal and tribal authorities, court will not suppress defendant's confession to FBI agent 17 days after being taken into tribal custody."); *United States v. Stowe*, 100 F.3d 494, 501 (7th Cir. 1996) ("Under 18 U.S.C. § 3501(c), a confession must be suppressed unless a delay before a defendant is brought before a magistrate is found to be reasonable. This statute does not apply in this case, however, because, as the district court concluded, Stowe was not originally arrested on federal charges; he was arrested initially by state authorities on state charges, detained for 36 hours based on those state charges, and only later were federal charges filed. Moreover, no evidence exists whatsoever of an 'improper collaboration between federal and state or local officers.'"). Courts in this district have held similarly. *United States v. Malave*, Crim. No. 13-266 (FAB), 2014 WL 12626355, at *1 (D.P.R. July 2, 2014) (Report and Recommendation adopted at 2014 WL 12626354 (D.P.R. Aug. 1, 2014).

---

(i)     *Puerto Rico v. Sánchez Valle* is limited to double
        jeopardy concerns

The Double Jeopardy Clause of the Fifth Amendment protects an individual from being "twice put in jeopardy of life or limb" for the same offense, U.S. Const. amend. V., if the prosecutions are brought by the same sovereign. *United States v. Santiago-Colón*, 917 F. 3d 43, 56 (1st Cir. 2019) (quoting *Sánchez Valle*, 136 S. Ct. at 1870). In *Sánchez Valle*, the Supreme Court faced the issue of whether Puerto Rico and the United States were the same sovereign for purposes of the Double Jeopardy Clause, which would in turn determine whether the federal and Puerto Rico governments were barred "from successively prosecuting a defendant on like charges for the same conduct." *Santiago-Colón*, 917 F.3d at 57 (citing *Sánchez Valle*, at 1870). To determine whether Puerto Rico and the United States were the same or different sovereigns for double jeopardy purposes, the Court performed a "historical, not functional," inquiry, *Santiago-Colón*, at 57 (citing *Sánchez Valle*, at 1871), looking only to "whether the prosecutorial powers of the two jurisdictions ha[d] independent origins." *Santiago-Colón*, 917 F.3d at 57 ((citing *Sánchez Valle*, at 1870) (citing *United States v. Wheeler*, 435 U.S. 313, 320 (1978)). It held that they did not, because "the oldest roots of Puerto Rico's power to prosecute lie in federal soil," *Sánchez Valle*, at 868, inasmuch as "Congress conferred the authority to create the Puerto Rico Constitution, which in turn confers the authority to bring criminal charges." *Id.* at 1876. Because the prosecutorial authority of both the federal government and Puerto Rico emanates from a single source—Congress—the two are considered a single sovereign for double jeopardy purposes and "the two governments cannot 'twice put' [an individual] 'in jeopardy' for the 'same offence.'" *Santiago Colón*, at 57 (quoting *Sánchez Valle* at 1875-77).

In this case, there are no double jeopardy concerns. The facts do not involve multiple charges or multiple sentences against a single individual. Accordingly, *Sánchez Valle's* narrow holding related to double jeopardy is inapposite.

_____

                        (ii)      Collateral estoppel and privity between Puerto Rico
                                  and federal agencies

Instead, this case involves a question of whether the actions of one
governmental entity, namely the PRPB, should be attributed to another
governmental entity, the FBI, in two separate investigations involving the arrest of
the same individual. The matter is more a question of collateral estoppel because the
controversy revolves around questions of "privity" between two governmental
agencies, the PRPB and the FBI.

Indeed, the Court finds that the facts and circumstances of this case are
analogous to those in the First Circuit's longstanding precedent established in the
cases of *Bonilla Romero*,[13] *Pérez-Pérez*,[14] and *Santiago Colón*.[15] These cases deal with
the issue of collateral estoppel as it relates to the suppression of evidence in a federal
criminal prosecution after a Puerto Rico court suppressed the same evidence in a
prior state criminal prosecution. Similarly, in this case, the specific legal question
being addressed by the Court is whether the FBI should be collaterally estopped from
using incriminating statements taken from the defendant while he was in federal
custody because he was arrested and placed in custody several hours earlier by PRPB
agents. For the reasons that follow, the Court answers that question in the negative.

In *Bonilla Romero*, the First Circuit rejected the defendant's contention that
the suppression of evidence by a Puerto Rico court in a local prosecution necessarily
required suppression of the same evidence in a subsequent federal prosecution.
836 F.2d at 41-45. There, Puerto Rico police officers had seized two firearms and
drugs from the car and house of the defendant, who was charged with weapons and
drug offenses under Puerto Rico law. *Id.* at 41. After holding a hearing, the
Puerto Rico trial court granted the defendant's motion to suppress because the local

---

[13] *United States v. Bonilla Romero*, 836 F. 2d 39 (1st Cir. 1987).

[14] *United States v. Pérez-Pérez*, 72 F. 3d 224 (1st Cir. 1995).

[15] *United States v. Santiago Colón*, 917 F.3d 43 (1st Cir. 2019).

_____

judge "seriously doubted the veracity" of the officers' testimony. *Id.* The local prosecution was subsequently dismissed. *Id.*

Months later, based on that same evidence, a grand jury returned an indictment charging the defendant with federal crimes. *Id.* The defendant sought to suppress the evidence in the federal district court proceeding because it had been previously suppressed in the local court proceeding. *Id.* In denying the motion, the district court "held that the federal court was not bound by the decision of the local court to suppress the evidence." *Id.* After conviction on all federal counts, the defendant appealed the denial of his motion to suppress, arguing, *inter alia*, that allowing the government to relitigate the suppression issue before the district court violated the Double Jeopardy Clause as well as collateral estoppel principles. *Id.*

The First Circuit rejected both challenges.[16] With respect to the collateral estoppel issue, the Court noted that the doctrine of collateral estoppel requires "that the party to be precluded from relitigating an issue decided in a previous litigation . . . either [had been] a party or [had been] *in privity* with a party to that prior litigation," and concluded that said requirement was not satisfied in *Bonilla Romero* because "the federal prosecutors were neither a party, nor in privity with a party, to the suppression hearing in the Puerto Rico Superior Court." *Id.* at 43. (Emphasis added). The Court clarified that "the source of authority of two government entities is not dispositive of whether they are in privity." *Id.* at 43. Thus, "Puerto Rico's

_____

[16] With respect to the Double Jeopardy issue in *Bonilla-Romero*, the *Santiago-Colón* court explained as follows:

> We rejected both challenges. First, regarding the double jeopardy challenge, we noted that "jeopardy 'attaches' when a trial commences; that is, when a jury is sworn or empaneled or, in a bench trial, when the judge begins to hear evidence." Because "jeopardy did not attach as a result of the suppression of evidence ordered . . . by the Puerto Rico . . . [c]ourt[,] and the subsequent dismissal of charges under Puerto Rico law," the litigation of the suppression of evidence issue in federal court did not violate the defendant's rights under the Double Jeopardy Clause. *Id.*

917 F.3d at 55.

_____

sovereignty status as a United States territory" has no bearing on the determination
of whether federal prosecutors would be bound by a prior suppression of the same
evidence by a Puerto Rico court. *Id.* at 44. Instead, the Court held that it "must
determine whether there was a close or significant relationship between the federal
and Puerto Rico prosecutors during the local suppression hearing or whether the
federal authorities controlled or actively participated in that hearing such that their
interests in enforcing federal law were sufficiently represented." *Id.*

Later, in *Pérez-Pérez*, the First Circuit reiterated *Bonilla Romero's* holding
that application of the doctrine of collateral estoppel in criminal cases requires that
"the party to be precluded . . . have been the same as, or in privity with, the party
who lost on that issue in the prior litigation. 72 F.3d at 226 (citing *Bonilla Romero*,
836 F.2d at 42-44).

Although *Bonilla Romero* and *Pérez-Pérez* were both decided prior to
*Sánchez Valle*, and as such, Puerto Rico and the United States had not yet been held
to be a single sovereign in the context of criminal proceedings for Double Jeopardy
purposes, in *Bonilla Romero* the First Circuit nevertheless considered the possible
effect of deeming Puerto Rico and the United States a single sovereign and rejected
that the "source of authority of [the] two governmental entities" could be "dispositive
of whether they are in privity." *Santiago-Colón* 917 F.3d at 58 (quoting *Bonilla
Romero*, 836 F.2d at 43).

In 2019, the First Circuit revisited its prior decisions in *Bonilla Romero* and
*Pérez-Pérez* after the Court's holding in *Sánchez Valle* when it reviewed a district
court order granting David Santiago-Colón's ("Santiago-Colón") motion to suppress
identification evidence and giving preclusive effect to a Puerto Rico Court of Appeal's
order suppressing the same evidence in a local proceeding for different offenses. The
district court had found that, because Puerto Rico and the United States are a single
sovereign for purposes of the Double Jeopardy Clause, it was bound by the local
court's judgment suppressing the identification evidence even though the federal
prosecutors "did not participate in the [Puerto Rico] court's criminal proceedings

_____

against Santiago Colón." *United States v. Santiago Colón*, 213 F. Supp. 3d 297, 298
(D.P.R. 2016). In its ruling overturning the district court, the First Circuit found that,
"the district court deviated from [this circuit's] on-point precedent holding that
suppression of evidence by a Puerto Rico court does not require a federal court to
suppress that same evidence unless federal prosecutors were a party, or were in
privity with a party, to the suppression hearing in the Puerto Rico court." *Bonilla
Romero*, 836 F.2d at 43-44. The First Circuit held that *Sánchez Valle* did not change
the law with respect to collateral estoppel and that *Bonilla Romero* is still good law.

Having established that the law regarding collateral estoppel had not changed
in Puerto Rico, the Court in *Santiago Colón* explained that to find that privity existed
between the federal and Puerto Rico prosecuting teams, the district court must have
made a fact specific analysis[17] and found that there was such "a close or significant
relationship between the federal and Puerto Rico prosecutors during the local
suppression [proceedings], [or in present case, the arrest by PRPB,] or whether the
federal authorities controlled or actively participated in [those proceedings], [or that
arrest], such that their interests in enforcing federal law were sufficiently
represented." *Santiago Colón*, at 61 (quoting *Bonilla Romero*, at 44). Because nothing
suggested that this happened in Santiago Colon's case, the Court found that there
was no privity between the two prosecuting authorities and, thus, collateral estoppel
was not applicable.

In this case, the Court similarly finds that there was no privity between
the PRPB and the FBI with respect to the defendant's two arrests some 31.5 hours
apart. The PRPB agents who arrested the defendant on Thursday, January 10, 2019,
did so based solely on their independent local investigation into the "theft of a
vehicle." Tr. at 34. No one from the FBI was consulted or even informed about the
existence of the local investigation on January 10, 2019. Tr. at 74. Indeed, the record
reflects that the FBI learned of the existence of the local investigation on January 11,

_____

[17] "Whether a party is virtually representative of a non-party is a question of fact determined on a
case-by-case basis." *Bonilla-Romero*, 836 F.2d at 43.

_____

2019, by happenstance.  An FBI Task Force Officer was serendipitously alerted to the existence of the state investigation because his wife's car was mistaken by PRPB agents for one of the cars involved in the carjacking because it was the same make and model of the vehicle they were looking for. Tr. at 36. There is no evidence that the federal authorities, namely the FBI, controlled or actively participated in or even knew of Pagán Santos' arrest on January 10, 2019, such that their interests in enforcing federal law were sufficiently represented.

In summary, neither the holding in *Sánchez Valle,* nor the First Circuit's longstanding precedent regarding collateral estoppel, supports the defendant's contention that the arrest of the defendant on Thursday, January 10, 2019, meant that the defendant was placed under federal custody at that time. Under the facts of this case, the Court finds that there was no privity between the PRPB and the FBI such that the arrest of the defendant by the PRPB should be attributed in any way to the FBI.

(iii)    The 2010 Memorandum of Understanding[18]

Pagán Santos argues, in the alternative, that the existence of the 2010 Memorandum of Understanding creates a "working arrangement" between federal and state officials such that "the [PRPB] detective who arrested and held the defendant in custody acted as an agent—and in furtherance—of 'the primary prosecutorial and investigatory jurisdiction of the United States.'" Docket No. 50 at 11. In support of this contention, the defendant cites to Section II(B) of the MOU, which provides, in relevant part, that:

> [t]he [PRDOJ] and [PRPB] shall have primary prosecutorial and investigative jurisdiction in all cases involving the theft of a motor vehicle by force, violence, or intimidation. However, *the USAO-PR and federal law enforcement agencies shall have primary prosecutorial and*

_____

[18] The MOU was <u>not</u> officially introduced into evidence during the suppression hearing. Nevertheless, a copy of the MOU was attached as an Exhibit to defendant's Motion to Suppress. Docket 50-1. The Court will treat this Exhibit as the same MOU that is discussed throughout the Motion to Suppress and the related briefing.

> investigatory jurisdiction in those motor vehicle theft cases
> involving:
>
> 1. *Death* or serious bodily injury
>    caused to any person during the
>    commission of the carjacking or as
>    a result thereof.

Docket No. 50-1 at 8 of 9. (Emphasis added). The defendant submits that, on its face, this language from the MOU demonstrates that "the Police of Puerto Rico act as agents of the federal prosecutorial team in all cases [involving] a carjacking resulting in death." Docket No. 50 at 10. The Court disagrees.

While it is true that the *McNabb-Mallory* rule may apply to local detention when there is a particular kind of arrangement between federal officials and the state officials holding the detainee, such working arrangement has not been held to apply blindly in all cases involving a particular criminal violation. [19] For example, in *Anderson v. United States*, 318 U.S. 350 (1943), a county sheriff arrested individuals and detained them for days while federal agents extensively interrogated them. *Id.* at 353. Only after they confessed were they arrested on federal charges and later arraigned before a federal magistrate judge. *Id.* at 356. The Supreme Court found that because there was a working arrangement between the federal officers and the sheriff during which they collaborated to bypass the presentment requirement, the confessions had to be suppressed. *Id.*

However, where such a working arrangement is alleged, the defendant has the burden of showing that the state involvement was used to circumvent Rule 5(a)(l)(A). *United States v. Carter*, 910 F.2d 1524, 1528 (7th Cir. 1990) ("the defendant has the burden of showing that state custody was designingly utilized by state and federal officials to circumvent Rule 5(a)." (Internal quotation marks and brackets omitted.)). Here, the Court finds that the defendant has fallen well short of meeting that burden.

---

[19] Indeed, to do so would be an abdication of the law enforcement agency's duty to investigate and prosecute crimes of a particular ilk.

To begin with, the MOU states, in relevant part, that:

### V. CONCLUDING STATEMENTS

> This agreement merely sets out the understanding between the Commonwealth and federal criminal justice agencies as to what the presumption will be regarding the investigative and prosecutorial responsibilities regarding the listed cases. *Nothing in this agreement precludes the parties from reaching an opposition* [sic] *conclusion to that listed in this agreement regarding a specific case or group of cases.* Such conclusions might be dictated by resources, interest, propriety of a particular matter being handled in one jurisdiction or the other, desires of the parties, etc. The gist of this argument is that such exceptions will be done, when necessary, in full communication between the parties.

Docket No. 50-1 at p. 8. (Emphasis added). The Court finds that, considering this language, the MOU sets forth nothing but a mere presumption as to how the two agencies intend to conduct themselves regarding the investigation of crimes that could result in prosecution by both jurisdictions. The express language of the MOU emphasizes that all decisions regarding assumption of investigative and prosecutorial duties may be modified on a case-by-case basis. Moreover, the mere existence of the MOU, combined with the fact that it clearly divides and identifies criminal jurisdiction into local and federal spheres, highlights the distinctiveness of both the local and the federal entities.

The facts of the present case buttress these findings and the Court's overall understanding of the MOU. On Thursday, January 10, 2019, Pagán Santos was placed under the custody of the PRPB and was interviewed by PRPB Agent Mercado Ruiz for "the theft of a motor vehicle by force, violence or intimidation;" a matter as to which the PRPB had primary jurisdiction under the MOU. During that evening and part of the next day, Agent Mercado Ruiz spent time on the street corroborating the information provided by Pagán Santos and in the early evening on Friday, January 11, 2019, Pagán Santos was taken to Mayagüez to speak to a state prosecutor for local prosecution and to discuss his possible cooperation with the PRPB

_____

investigation. At no time during this process did PRPB Agent Mercado Ruiz contact the FBI or coordinate his investigative steps with federal agents.

It wasn't until some point during the afternoon of January 11, 2019, that the FBI became aware of the PRPB investigation. Thereafter, FBI SA Cancel consulted the case with PRPB Agent Mercado Ruiz and at around 8:00PM that evening the FBI officially "assumed" jurisdiction over the investigation. Tr. at 77. Once the FBI determined that it would take over the investigation, PRPB Agent Mercado Ruiz transferred all the evidence and relinquished custody over Pagán Santos and Javier to the FBI. This physical transfer of the two suspects, all the evidence, and the receipts from PRPB to the FBI was more than just a symbolic gesture. It was the literal death of the PRPB car-theft investigation, and the birth of the federal investigation into the carjacking-death of the victim, Deny Delgado-Figueroa.

The lack of evidence of a pre-coordinated working arrangement between federal and local agents in this case further demonstrates that the MOU does not grant automatic authority for local PRPB agents to investigate or file federal charges.[20] Indeed, as demonstrated by the specific facts of this case, the MOU does not even recognize or create automatic federal jurisdiction over the matters listed. This is so because, under the MOU, the federal agency must affirmatively decide to "assume" jurisdiction over a particular matter before the matter can be transferred to federal agents for investigation and prosecution. Absent an assumption of jurisdiction by the federal agency, in this case the FBI, the matter is deemed to remain under local jurisdiction for further processing. *See*, the MOU, Docket 50-1. To be sure, as long as there is a decision to be made as to whether the federal agency will or will not assume jurisdiction over an investigation there cannot be unity of

_____

[20] The MOU also fails to grant a reciprocal authority for federal agents to investigate or file state charges. The Court does not rule out the possibility that specific state and federal statutes might authorize federal agents to do so, but the MOU, on its face, does not. For example, the FBI has special investigative jurisdiction over specific violations of state law, to wit, felony killings of state law enforcement officers (28 U.S.C. § 540), violent crimes against interstate travelers (28 U.S.C. § 540A), and serial killers (28 U.S.C. § 540B). However, a request by an appropriate state official is required before the FBI can assume authority to investigate these matters.

*United States v. Andrés Noel Pagán-Santos,*
Crim. No. 19-068 (PAD)

Page 38

action. Accordingly, the Court finds that the MOU did not, and does not on its face, serve to create a "working arrangement" between the PRPB and the FBI.

To wrap it up, in the present case, the arrest of Pagán Santos on Thursday, January 10, 2019, was done without the knowledge, consultation, or permission of the FBI. As such, there was no privity between the PRPB agents who arrested Pagán Santos on Thursday, January 10, 2019, and the FBI agents who arrested Pagán Santos on Friday, January 11, 2019. Having so determined and having also determined that the MOU *did not* create a working arrangement between the two governmental agencies either, the Court finds that the arrest by PRPB agents did not have the effect of placing Pagán Santos immediately into federal custody. Accordingly, the Court finds that Pagán Santos' inculpatory statement made to the FBI at 10:16PM on Friday, January 11, 2019, was made within just a few hours, and certainly less than 6 hours, of his being placed under federal custody. Therefore, under the *McNabb-Mallory* rule, as revised by § 3501(c), "[i]f the confession came within [six hours of arrest], it is admissible, subject to the other Rules of Evidence, so long as it was 'made voluntarily and . . . the weight to be given [it] is left to the jury.'" *Id.* (quoting 18 U.S.C. § 3501(c)); *see also, United States v. Galindo-Serrano*, 925 F.3d 40 (2019).

           b.    *Voluntariness of the inculpatory statement made to the FBI on Friday, January 11, 2019, under 18 U.S.C. §§ 3501(a) and (b)*

Being persuaded that the statement made by the defendant to the FBI on Friday, January 11, 2019, falls within the 6-hour safe-harbor window provided by the *McNabb-Mallory* rule, as codified by 18 U.S.C. 3501(c), the Court must now determine whether the statement was voluntary under 18 U.S.C. §§ 3501(a). *See also, United States v. Marrero*, 450 F.2d 373 (1971). Section 3501(b), provides that in determining the issue of voluntariness, the trial judge shall take into consideration all the circumstances surrounding the giving of the confession, including

*United States v. Andrés Noel Pagán-Santos,*
Crim. No. 19-068 (PAD)

Page 39

_____

> (1) the time elapsing between arrest and arraignment of the defendant making the confession, if it was made after arrest and before arraignment, (2) whether such defendant knew the nature of the offense with which he was charged or of which he was suspected at the time of making the confession, (3) whether or not such defendant was advised or knew that he was not required to make any statement and that any such statement could be used against him, (4) whether or not such defendant had been advised prior to questioning of his right to the assistance of counsel; and (5) whether or not such defendant was without the assistance of counsel when questioned and when giving such confession.

Section 3501(b) further provides that "[t]he presence or absence of any of the above-mentioned factors to be taken into consideration by the judge need not be conclusive on the issue of voluntariness of the confession." *Id.*

The Court need not discuss each element set forth in Section 3501(c), as it has already determined in Section II(A)(2) *supra*, that based on the uncontroverted facts deduced from the suppression hearing, the defendant's statement made to the FBI on Friday, January 11, 2019, was made after a knowing and voluntary waiver of his *Miranda* rights. The criteria addressed in that adjudication encompasses the totality of the circumstances during the statement and conforms to the factors proposed in Section 3501(c). As such, the Court finds that such finding of voluntariness applies equally to this *McNabb-Mallory* Rule 5 prompt presentment analysis.

> c.      *Because the Friday night interview with the FBI was conducted within the 6-hour window provided for by the McNabb-Mallory rule, there was no unreasonable delay*

The Court has determined that the defendant was not placed under "federal custody" until he was arrested by the FBI at approximately 8:00PM on Friday, January 11, 2019, and that because his interview by the FBI took place approximately 2 hours later, the statement was timely. Having so determined, the Court need not delve into the issue of whether any delay in presentment was reasonable, because, simply put, the statement fell within the 6-hour safe-harbor

window provided for by the *McNabb-Mallory* rule, Rule 5, and Section 3501(c). The Court therefore finds that the statement made to the FBI on Friday, January 11, 2019, is fully admissible.

        3.   <u>Pagán Santos' prompt presentment attack on the inculpatory</u>
             <u>statement made to the FBI on Saturday, January 12, 2019</u>

Pagán Santos argues that the statement he made to FBI TFO Valle en route from the FBI's field office in Aguadilla to the Metropolitan Detention Center in Guaynabo on Saturday, January 12, 2019, at approximately 9:30AM, should be suppressed because it too violates the requirements of prompt presentment established by the *McNabb-Mallory* rule, Rule 5, and Section 3501(c). He contends: 1) that, on its face, the statement was made more than 6 hours after his arrest, even if the Court were to begin counting from the moment of his arrest by FBI agents at 8:00PM the night before, and 2) the agents should have brought the defendant before a state or federal magistrate overnight and over the weekend, and because they did not, the delay in presentment was unreasonable and the Saturday statement should be suppressed.

The government argues in response, first, that a voluntary waiver of one's *Miranda* rights also constitutes a *de facto* waiver of prompt presentment, and second, that even if the Court does not find a *de facto* waiver of prompt presentment after a voluntary waiver of *Miranda*, the delay in presentment in this case was nevertheless wholly reasonable and necessary under the circumstances. The Court sides generally with the government.[21]

        a.   *Six courts of appeal have held that a voluntary waiver of*
             *one's Miranda rights constitutes a de facto waiver of*
             *presentment*

In its Opposition, the government concedes that the statement that Pagán Santos made to the FBI on Saturday, January 12, 2019, was made outside the

---

[21] The Court notes that in Section II(A)(3) *supra*, it has already discussed and found that Pagán Santos' statement made to the FBI on Saturday morning was given knowingly, voluntarily and without coercion. For that reason, the Court refrains from repeating that aspect of the *McNabb-Mallory*, Rule 5, and Section 3501(c) voluntariness analysis here.

6-hour safe-harbor window provided by the *McNabb-Mallory* rule, Rule 5, and Section 3501(c). Indeed, the Court finds as much considering the fact that the defendant was arrested by the FBI at 8:00PM on Friday, January 11, 2019, and Pagán Santos' statement *en route* to MDC was made at 9:30AM the next morning, a total of 13.5 hours later.

The government also correctly points out that a defendant may waive his right to prompt presentment. Docket No. 56 at 10. *See, e.g., United States v. McDowell,* 687 F.3d 904, 910 (7th Cir. 2012) ("the right to prompt presentment may be waived"); *Outlaw v. United States,* 806 A.2d 1192, 1200 (D.C. Cir. 2002) ("the prohibition against unnecessary delay reflected in the *Mallory/McNabb* doctrine, and in Fed. R. Crim. P. 5(a), may be waived"); *See generally, Peretz v. United States,* 501 U.S. 923, 936 (1991) ("The most basic rights of criminal defendants are . . . subject to waiver."). Consistent with that waiver, the government notes that at least six courts of appeal have held that a *Miranda* waiver also waives the right to prompt presentment.[22] The First Circuit, however, has not yet addressed the issue.

---

[22] *See, e.g.*, *O'Neal v. United States*, 411 F.2d 131, 136 (5th Cir. 1969) ("Mallory was decided before *Miranda v. Arizona*, (1966), 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694. Mallory was intended to insure that a suspect not be held for long hours of interrogation during which he had only his own personal stamina with which to resist an overbearing police barrage, and that if he were so intimidated the evidence thus gleaned could not be used at trial. With *Miranda*, however, came the decree that all persons taken into custody must be immediately warned of certain constitutional rights."); *United States v. Cobb*, 2017 WL 9472899, at *15 n.26 (N.D. Ga. June 1, 2017), report and recommendation adopted, 2017 WL 3225063 (N.D. Ga. July 28, 2017) (defendant "waived any objection to delay in presentment via his *Miranda* waiver"); *United States v. Villanueva*, 2016 WL 3344227, at *9 (M.D. Fla. June 13, 2016) ("In this case, Defendant Martin waived his *Miranda* rights prior to the commencement of the June 13, 2014 statements; Defendant Martin waived any objection to delay in presentment via his *Miranda* waiver."). *United States v. Woodley*, 713 F. App'x 449, 456 (6th Cir. 2017) (unpublished) ("Sixth Circuit precedent holds that waiver of one's *Miranda* rights also constitutes a waiver under *McNabb-Mallory*") (internal quotation marks omitted); *United States v. Barlow*, 693 F.2d 954, 959 (6th Cir. 1982) ("[W]aiver of one's *Miranda* rights also constitutes a waiver under *McNabb-Mallory*."). *United States v. Jackson*, 712 F.2d 1283, 1287 (8th Cir. 1983) ("The District Court properly found that Jackson was cognizant of his constitutional rights and voluntarily and knowingly waived them . . . . On this record, there is no appreciable chance that the single factor of delay in arraignment would produce a finding that the confession was involuntary.") *United States v. Childs*, 944 F.2d 491, 496 (9th Cir. 1991) ("*Mallory* does not apply where the defendant has waived his *Miranda* rights"); *United States v. Binder*, 769 F.2d 595, 598 (9th Cir. 1985) ("The waiver of legal rights following *Miranda* warnings also constitutes a waiver of those rights under Federal Rule of Criminal

*United States v. Andrés Noel Pagán-Santos,*
Crim. No. 19-068 (PAD)

Page 42

The rationale behind the *de facto* waiver is that "the fundamental concerns that led to the *Mallory* and *McNabb* decisions are adequately addressed by compliance with the requirements of *Miranda,* which was decided after *Mallory* and *McNabb.*" *United States v. Bell,* 740 A.2d 958, 964 (D.C. Cir. 1999).[23]

While there is significant support for the government's contention that a voluntary waiver of *Miranda* also serves as a *de facto* waiver of prompt presentment, the Court finds that there is no need to venture down that prickly road only to guess

_____

Procedure 5."), overruled in part on other grounds by *United States v. Morales*, 108 F.3d 1031 (9th Cir.1997); *United States v. Hernández-Orellana*, 2006 WL 8439365, at *9 n.13 (S.D. Cal. May 25, 2006) ("[A]nother ground for not suppressing the confessions is that by waiving their *Miranda* rights, Defendants Ramos-Vásquez and Hernández also waived their Rule 5(a) rights."). *See also*, Charles Alan Wright et al., Fed Prac. & Proc. Crim. vol. 1 § 74 ("The *Miranda* Rules") (4th ed., West 2019) ("Rule 5(a)'s role as a mean to regulate confessions has largely disappeared. It has been replaced primarily by the doctrine of *Miranda v. Arizona*, which provides detailed rules for when a confession may and may not be used.").

[23] The Court of Appeals for the D.C. Circuit has held that,

> [T]he primary purpose of the *Mallory* rule is to ensure that suspects are advised of their rights to silence and counsel, to prevent the coercion inherent in prolonged custodial isolation. When there is intelligent waiver of the rights to counsel and to remain silent, and the accused voluntarily submits to interrogation, this aim of the *Mallory* rule is accomplished.

*United States v. Poole*, 495 F.2d 115, 120 (D.C. Cir. 1974), cert. denied, 422 U.S. 1048 (1975).

This same reasoning was elaborated upon in a district court opinion from the district of the U.S. Virgin Islands:

> The *McNabb-Mallory* rule antedated the *Miranda* decision and was intended to assure defendants of certain procedural rights which *Miranda* later secured to them still more definitely. The two lines of decision are thus cumulative, and they have their most important feature in common. That is provision of mechanisms for promptly informing an arrestee of his basic rights-through judicial warnings under *McNabb-Mallory* and police warnings under *Miranda*. Since the two rules result in similar cautions being delivered, once the police have read a suspect his Miranda rights there is less urgency to bringing him before a judge. In these circumstances a somewhat longer delay would still be reasonable.

Gov't of *Virgin Islands v. Gereau*, No. Crim. 97-1972, 1973 WL 354203, at *24 (D.V.I. July 23, 1973)

*United States v. Andrés Noel Pagán-Santos,*
Crim. No. 19-068 (PAD)

Page 43

how the First Circuit might rule on the issue.[24] Instead, the Court finds that the facts alone more than adequately demonstrate that the 13.5-hour detention pending presentment in this case was reasonable and necessary under the circumstances. The Court explains.

>    *b.    Reasonableness of the 13.5 hour-detention in this case*

Defendant's alternate attack on the reasonableness of the delay in presenting him before a magistrate judge prior to his making a second inculpatory statement to the FBI on Saturday, January 12, 2019, is that his detention overnight, and over the weekend, was unreasonable. The defendant contends instead that the agents should have taken him before a magistrate judge in the middle of the night on Friday; and if none was available, then they should have taken him before the "Emergency Magistrate Judge;"[25] and, in a worst-case scenario, if neither of the forgoing was available, they should have taken him before a Puerto Rico state court judge to be arraigned.

---

[24] The Seventh Circuit, for example, has left the issue open. *United States v. McDowell*, 687 F.3d 904, 911 (7th Cir. 2012) ("We need not decide whether a valid *Miranda* waiver also waives *McNabb-Mallory*. As we have explained, McDowell's written waiver of his Rule 5(a) right to prompt presentment waived the remedy of *McNabb-Mallory*."). By contrast, some district courts have criticized the idea that a *Miranda* waiver signifies a waiver under *McNabb-Mallory*. *See, e.g., United States v. Pena Ontiveros*, 2008 WL 2446824, at *5 (S.D.N.Y. June 16, 2008) (concluding that Second-Circuit precedent does not equate a *Miranda* waiver with a waiver of timely presentment).

[25] In support of his contention, he cites to Local Rule of Procedure 159(c), which provides in relevant part as follows:

> **(c) Emergency Magistrate Judge.**
> One of the magistrate judges is designated as the emergency duty magistrate judge for each week of the calendar year. The magistrate judge designated as the emergency magistrate judge during a particular week is the emergency duty magistrate judge for all requests and complaints submitted by all U.S. Government agencies within the territorial jurisdiction of the District of Puerto Rico including, but not limited to: filing of criminal complaints; issuance of warrants of arrest, to search, to seize; for site inspection; presentations for initial bail determinations or detention; conduct preliminary examinations pursuant to Fed. R. Crim. P. 5.1; removal proceedings pursuant to Fed. R. Crim. P. 40; grand jury returns; appointment of counsel in criminal cases in connection with original matters; applications for pen registers, traps and traces, and other electronic tracking devices; and other matters within the original jurisdiction of magistrate judges.

_____

The issue of whether an overnight stay or a weekend stay is reasonable under the *McNabb-Mallory* rule, Rule 5, or Section 3501(c), is neither novel nor new. Nevertheless, the First Circuit has not yet had the occasion to deal with either scenario. The Court is therefore forced to look to other circuits for wisdom and guidance. And its research has shown that, in most situations, unless there are some additional facts onto which to grasp, courts have routinely found that neither an overnight stay, nor a weekend stay, without more, transformed a delay beyond the 6-hour safe-harbor window into an unreasonable delay under a *McNabb-Mallory* analysis. *See, e.g.*, *United States v. Marrero*, 450 F.2d 373 (2d Cir. 1971) ("There was no sinister purpose here in lodging the defendant overnight. Magistrates and commissioners are not available at night in the Southern District and there is no nearest magistrate to whom a person charged with a crime can be reasonably transported . . . Overnight lodging is certainly no more offensive than transportation."). *United States v. Lasley*, No. 8:11CR19, 2011 WL 1630936, at *4 (D. Neb. Apr. 29, 2011) ("Lasley was arrested too late in the day on Friday to allow for her transportation and processing on the same day. Additionally, she was to be brought to Omaha with two other defendants from some distance . . . The evidence does not state why the appearance was not scheduled for Monday, January 31, 2011, but a reasonable inference is that a magistrate judge was not available until Tuesday, February 1, 2011, and the evidence shows that it was not unusual to have a Tuesday initial appearance for a defendant arrested the previous Friday. There is no requirement, even under Rule 5(c)(l)(B), that a defendant be presented to a state court judge in the absence of a federal magistrate judge . . . The delay between Lasley's arrest on January 28, 2011, and February 3, 2011, was reasonable."); *United States v. Harrold*, 679 F. Supp. 2d 1336, 1353 (N.D. Ga. 2009) (holding that "an overnight or weekend delay due to the unavailability of a magistrate judge is not unreasonable" and holding further that a weekend delay was reasonable because the magistrate judge would not take any initial appearances after Friday at 2:30 p.m.).

_____

Additionally, in *United States v. Redlightning*, 624 F.3d 1090, 1107-09 (9th Cir. 2010), the Court of Appeals for the Ninth Circuit was faced with a factual scenario very similar to this case involving a second confession made en route to an arraignment the day after the defendant's arrest, and after an overnight stay. In *Redlightning*, the defendant argued that his confession to the murder of a woman[26] on Native American land should have been suppressed because the agents failed to promptly present him before a federal magistrate judge in Seattle, Washington before the 2:30PM daily calendared and scheduled arraignment time for federal defendants.

The defendant, Henry Redlightning ("Redlightning"), was originally arrested in Bellingham, Washington, around 12:22PM on October 2, 2007. Bellingham is approximately 90 miles away from Seattle, Washington. Upon arresting him, the agents had a choice of interviewing him related to the murder, or immediately transporting him back to Seattle, Washington, in order to make it before the 2:30PM arraignment time. The agents naturally chose to interview him about the murder. The interview lasted until about 1:45PM. By that time, the agents could not have made it back to Seattle in time for the scheduled 2:30PM arraignment. The agents therefore continued to question Redlightning about matters unrelated to the murder. After completing the interview at approximately 5:30PM, the agents took him to his home to retrieve some medication and then they delivered him to the Whatcom County Jail for an overnight stay.

The next day, October 3, 2007, the agents picked him up at the jail to take him to Seattle for his arraignment. En route to Seattle, the agent received a call from the prosecutor who asked him to "reinterview" Redlightning in order to elicit his motivation for the killing and to "finish the interview" from the day before. *Id.* at 1108. In response, the FBI agent took a detour to the nearest FBI office, which was in Everett, Washington, to interrogate Redlightning. The questioning lasted approximately 15 minutes and resulted in another confession. *Id.*

_____

[26] The woman's name was Rita Disanjh.

On appeal, the Ninth Circuit noted the following with respect to Redlightning's October 2 statements:

> The District Court concluded that Redlightning was effectively arrested at 12:22 p.m. on October 2 because that was the moment he first confessed to the Disanjh murder. If the FBI agents had stopped questioning Redlightning then, immediately upon his confession, they perhaps could have reached Seattle in time for the 2:30 p.m. arraignment. However, because the agents were entitled to at least a six-hour safe harbor to continue questioning Redlightning, the FBI was under no obligation to stop the questioning immediately the moment Redlightning confessed, nor would it have been reasonable for them to do so. Because the interview ended at 5:30 p.m. on October 2, which was well within the six-hour safe harbor, the FBI agents could not have transported Redlightning to the Seattle courthouse in time for the October 2 arraignment calendar. We hold that the agents did not violate the prompt-presentment requirement by not delivering Redlightning to Seattle on October 2.

With respect to the October 3 confession, the court stated that,

> Because the government reasonably intended to transport Redlightning via automobile to a magistrate judge presiding about 90 miles away, and therefore could not have delivered Redlightning by the 2:30 p.m. arraignment scheduled on October 2, the delay until 2:30 p.m. on October 3 was reasonable considering the means of transportation and the distance to be traveled to the nearest available magistrate. Redlightning's subsequent confession made en route to the October 3 arraignment, although made beyond the six-hour safe harbor after Redlightning's arrest on October 2, was made before arraignment scheduled at a reasonable time under the circumstances. For that reason, Redlightning's October 3 confession at the Everett FBI office did not run afoul of the prompt-presentment requirement.

In a somewhat older case than *Redlightning, United States v. Poyck*, 77 F.3d 285 (1996), the Ninth Circuit dealt with the issue of a confession made after a weekend stay. In *Poyck*, the defendant, Van Poyck, was arrested on Friday afternoon,

May 21, 1993, by California state officers. On Monday morning, May 24, 1993, he was transferred to federal custody and made his initial appearance before a federal magistrate judge. On the way to his initial appearance, Van Poyck made several incriminating statements to the federal officer driving with him. No federal magistrate judges were available over the weekend to arraign him.

In ruling on the reasonableness of the statement made after a weekend stay, as well as whether the government could reasonably be expected to search out a magistrate judge over the weekend, the court stated as follows:

> Other circuits have explicitly found weekend delays reasonable when due to the unavailability of a magistrate. *See, United States v. Mendoza*, 473 F.2d 697, 702 (5th Cir. 1973) (finding delay between Saturday morning arraignment and Monday morning arrest reasonable); *Gregory v. United States*, 364 F.2d 210, 212 (10th Cir.), cert. denied, 385 U.S. 962, 87 S. Ct. 405, 17 L.Ed.2d 307 (1966) (finding delay between Friday night arrest and Monday morning arraignment reasonable); *United States v. Collins*, 349 F.2d 296, 298 (6th Cir. 1965) (same).
>
>  The result reached in all these cases is dictated by the complex procedures needed to arraign a defendant. An arraignment requires court personnel to randomly select a judge, requires pretrial services to process the defendant, and often requires an interpreter; this is simply not a task that can be performed in a magistrate [judge]'s living room. We therefore now explicitly hold what has been implicitly understood all along: An overnight or weekend delay in arraignment due to the unavailability of a magistrate does not by itself render the delay unreasonable under § 3501(c). The same concerns which underlie our holding persuade us to reject the argument that the alternative arraignment procedures set forth in Rule 5(a) render a weekend delay unreasonable. Rule 5(a) provides that the person to be arraigned should be taken "before a state or local judicial officer authorized by 18 U.S.C. § 3041" if a magistrate judge is "not reasonably available." Fed. R. Crim. P. 5(a). In his concurrence, Judge Noonan seems to concede that a federal magistrate judge may not be reasonably available over the weekend, *see* infra at 293; by insisting that a

defendant be arraigned by state or local judicial officers over such a weekend, however, he suggests that these other officers are so available. It seems logical to assume that the purpose of any alternative arraignment provision would only be achieved if the government provided a defendant the same type of arraignment before a state or local judicial officer as would be provided [before] a federal magistrate. State and local judges are just as likely to be unavailable for arraignments on nights and weekends as a federal magistrate judge.[27] With that in mind, we do not believe that this provision of Rule 5(a) requires that the defendant be brought before either a federal magistrate or a state or local judicial officer at night or on the weekend.

*Poyck*, at 289-90. (Footnotes omitted)

In the present case, Pagán Santos' interview with the FBI concluded close to midnight on Saturday morning, well within the 6-hour safe-harbor window provided by the *McNabb-Mallory* rule, Rule 5 and Section 3501(c). Because of the very late hour and because MDC was approximately 80 miles away, it was wholly reasonable for the agents to house the defendant overnight. Moreover, even if the agents had decided to transport him to Guaynabo immediately after concluding the interview, MDC would not have accepted him at that late hour. Therefore, transporting him at that hour would have served no purpose other than to create a security risk for the agents and the defendant.

In addition, as the parties well know, the Court is closed on weekends and a magistrate judge is not readily available to carry out initial appearances. That is so because an initial appearance requires the participation of: 1) a courtroom deputy to open court and run the audio recording device to create a record of the proceeding, 2) a Spanish language interpreter for nearly every case handled in this district, 3) an assistant federal public defender on duty to meet with and orient the defendant as to the charges and the maximum penalties, and 4) one or more deputy

---

[27] It seems much more likely that this provision was inserted to address occasions when the only magistrate judges in the district are ill or out of the district. If this happened, an equivalent arraignment could be made by a state or local judicial officer pursuant to § 3041, but even that would almost certainly need to be performed during normal court hours.

*United States v. Andrés Noel Pagán-Santos,*
Crim. No. 19-068 (PAD)

Page 49

U.S. Marshals to take custody of the defendant after he has completed his initial appearance and to transport him to MDC to be housed pending further legal proceedings. The availability of all of these individuals is difficult to coordinate under normal circumstances, but relatively impossible to coordinate in the middle of the night or over the weekend when the Court is closed.

It is important to note, however, that the availability of a magistrate judge on the weekends to conduct an initial appearance, as the defendant suggests, is not to be confused with the role of an "emergency magistrate judge," better known in this district as the "duty magistrate judge," who *is* available 24 hours a day, seven days a week, to make probable cause determinations within 48 hours of a warrantless arrest. *See*, *County of Riverside v. McLaughlin*, 500 U.S. 44, 56, 111 S. Ct. 1661, 1669, 114 L. Ed. 2d 49 (1991). Such probable cause determinations can be made solely on the basis of written affidavits and do not require the services of any personnel beyond the judicial officer. Moreover, the concerns that animated the *McLaughlin* decision—the special harm of detaining a person without a prior determination of whether detention is supported by probable cause—are not implicated in this case because the duty magistrate judge made a determination of probable cause on Saturday, January 12, 2019, well within 48 hours of Pagán Santos' arrest.

In this case, the agents picked up the defendant first thing in the morning on Saturday to transport him to MDC. While en route, Pagán Santos volunteered to make a self-serving clarification to his prior inculpatory statements. He was not questioned by the agent and therefore was not "interrogated" like the defendant in *Redlightning* was at the specific request of the prosecutor. By all accounts, the record here demonstrates that TFO Valle simply recorded what the defendant had to say. *See, United States v. Davis*, 773 F.3d 334, 339 (1st Cir. 2014) ("[B]ecause Sergeant Bryant's questions during that exchange did not constitute the 'functional equivalent' of interrogation, defendant's statement made during transport to the sheriff's station did not violate his Fifth Amendment right to be free from self-

*United States v. Andrés Noel Pagán-Santos,*
Crim. No. 19-068 (PAD)

Page 50

incrimination."); *United States v. Rogers*, 41 F.3d 25, 31 (1st Cir. 1994) (upholding refusal to suppress defendant's "voluntary and spontaneous" statements while in custody); *United States v. Taylor*, 985 F.2d 3, 6-7 (1st Cir. 1993) (finding no interrogation, even though defendant was in police car, where defendant asked "Why is this happening to me?;" officer responded "You can't be growing dope on your property like that;" and defendant then made incriminating statements).

In sum, the Court finds nothing sinister or improper with the agent's decision to house the defendant overnight on Friday in a holding cell in Moca, transport him to MDC first thing Saturday morning, then proceed to contact the magistrate judge on duty to submit a criminal complaint for a determination of probable cause. Recognizing that suppression of evidence is a draconian measure geared to punishing illegal police conduct and deterring such conduct in the future, in this case, the Court cannot point to any misconduct on the part of law enforcement in detaining him for 13.5 hours prior to obtaining his voluntary statement en route to MDC. As such, the Court finds that Pagán Santos' statement made to FBI TFO Valle on Saturday morning is fully admissible.

In conclusion, given the government's representation that Pagán Santos' statement made en route from MDC to the courthouse on Monday, January 14, 2019, will not be used in its case-in-chief and is therefore moot, the Court will forego any additional analysis regarding the reasonableness of any delay involving that statement. Suffice it say, however, that irrespective of whether defendant's continued detention after Saturday, January 12, 2019, at 9:40AM, was in any way illegal, does not retroactively change the circumstances under which the Thursday, Friday or Saturday statements were made. *See, Upshaw*, 335 U.S. at 413. Therefore, the Court finds that those three statements are fully admissible.

III.     **CONCLUSION**

For the reasons espoused above, it is hereby **RECOMMENDED** that the defendant's Motion to Suppress at Docket No. 50 be **DENIED**.

The parties have fourteen days to file any objections to this Report and Recommendation. Failure to file the same within the specified time waives the right to appeal this Report and Recommendation. Henley Drilling Co. v. McGee, 36 F.3d 143, 150-51 (1st Cir. 1994); *United States v. Valencia Copete*, 792 F.2d 4 (1st Cir. 1986).

**IT IS SO RECOMMENDED.**

In San Juan, Puerto Rico, this 6th day of July 2022.

MARSHAL D. MORGAN
United States Magistrate Judge